UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAMONT HEARD,

        *Plaintiff,*

v.

        CASE NO. 2:21-cv-10237

        DISTRICT JUDGE NANCY G. EDMUNDS

VARNICE STRANGE,
JEFFREY OOSTERHOFF,
ADAM DOUGLAS,
SCOTT SCHOOLEY,
KYLE SHANNON,
CEDRIC GRIFFEY, and
CHRIATIAN ALCORN

        MAGISTRATE JUDGE PATRICIA T. MORRIS

        *Defendants.* [1]
_____/

## REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 23)

## I.  RECOMMENDATION

For the following reasons, **I RECOMMEND** that this Court **DENY** Plaintiff's motion for summary judgement (ECF No. 23.)

## II.  REPORT

### A.  Introduction

The parties in this prisoner litigation tell two conflicting versions of events. Lamont Heard claims that while filing a lawsuit against a group of state officials with some of his

---

[1] The undersigned recognizes that the docket misspells "Yarnice Strange" as "Varnice Strange" and "Christian Alcorn as "Chriatian Alcorn." (*See* ECF No. 31, PageID.141.) Defendants Schooley, Shannon, and Griffey were dismissed from this action on August 16, 2021.

fellow inmates, the Defendants transferred him from a privileged housing unit to a significantly more dangerous "gang" unit, motivated by animus towards Heard's Islamic faith and a desire to quell Heard's litigation.  This transfer impeded his ability to confer with his co-plaintiffs and pursue his lawsuit.  In response, the Defendants deny any religious animus and maintain that not only were both housing units identical in terms of safety and privileges, but that Heard could still meet with his co-plaintiffs to discuss his case.  The Defendants explain that they transferred Heard because they observed him recruiting younger inmates to the Nation of Islam and were concerned that this might give Heard excessive influence over other prisoners, threatening prison safety and order.

Despite the conflicted record, Heard moves this Court to enter summary judgment, arguing that no genuine disputes of material fact need be resolved.  For the following reasons, I recommend that the Court deny Heard's motion.

## B.      Background

Heard is an inmate in the custody of the Michigan Department of Corrections ("MDOC").  (ECF No. 31, PageID.203–05.)  In 2016, Heard and two other inmates, Richard Baldwin and Jerome Smith, filed a lawsuit against a group of Michigan officials.  (ECF No. 23, PageID.116.)  All three men lived in the same housing unit and would regularly meet with each other to discuss their case.  (*Id.* at PageID.92, 116.)  Heard and his co-plaintiffs were Muslims, and during these meetings they would occasionally discuss Islam.  (ECF No. 23, PageID.92, 115.)  Heard and his co-plaintiffs conducted these meetings in view of Jeffrey Oosterhoff, a prison counselor.  (*Id.* at PageID.115–16.)

2

Although Oosterhoff could see the inmates, he could not hear their discussions and did not personally know what the men were discussing; however, Heard claims that Oosterhoff knew they were involved in litigation because he would approve their legal mail.  (*Id.*)

During this time, Heard claims that Christian Alcorn, residential unit officer, regularly harassed him for practicing Islam.  (*Id.* at PageID.113–14.)  Indeed, while Heard lived in Alcorn's housing unit, Alcorn would "shake . . . down" Heard's cell and tell other prisoners that Heard was a Muslim.  (*Id.*)  Eventually, Alcorn reported to Oosterhoff that he saw Heard recruiting other inmates into either the Nation of Islam or the Moorish Science Temple of America, which Alcorn described as "gangs."  (*Id.* at PageID.104–05.) Heard denies that he proselytized either religion and states that Alcorn and Oosterhoff "fabricat[ed]" this allegation.  (*See id.* at PageID.93.)

Heard believes that Oosterhoff was concerned with both Heard's litigation and Alcorn's reports that Heard had been recruiting other prisoners to the Nation of Islam.  For these reasons, Heard argues that Oosterhoff contacted Yarnice Strange, the residential unit supervisor of a separate housing unit, Burns-A, hoping to transfer Heard from his former unit, Auburn-A.  (*Id.* at PageID.116.)  Oosterhoff and Strange agreed to the transfer, and with their supervisor's approval, Heard moved from Auburn to Burns.  (ECF No. 31, PageID.175.)

Oosterhoff and Alcorn, of course, tell a different story.  While the Defendants admit that Heard had ongoing litigation around the time they transferred him, Oosterhoff swears that he did not know that Heard was involved in litigation, explaining that of the "200 prisoners in [his] unit, . . . many are involved in litigation." (*Id.* at PageID.176.)  Not only

would it be "impossible" for him to know which inmates have ongoing litigation, but "the substance of inmate litigation is not relevant" to his duties as a counselor.  (*Id.*)

Similarly, while Alcorn filed an affidavit explaining that he did not remember the transfer at issue, he also denied any harassment and explained that he held no "animosity for Heard" based on his religion.  (*Id.* at PageID.186–87.)  Alcorn also explained that he could not grant or formally request a transfer—only Oosterhoff and Strange, with their supervisor's approval, could have authorized Heard's transfer.  (*Id.*)

The Defendants assert that Oosterhoff did not initiate Heard's transfer to Burns because he desired to suppress Heard's litigation or his religious discussions with other Muslims.  (Id. at PageID.175–76.)  Rather, the Defendants explain that Alcorn observed Heard attempting to convert other inmates to either the Nation of Islam or the Moorish Science Temple of America.  (*Id.* at PageID.175–76, 181–82; ECF No. 23, PageID.104–05.)  Heard's unit, Auburn-A, housed most of the prison's minors, and the Defendants were concerned that by preaching to younger inmates, Heard might gain influence in the prison which he could use in "nefarious ways."  (*Id.* at PageID.171, 181.)

Heard describes Burns as a "gang unit" where the prison housed known gang members.  (ECF No. 23, PageID.96.)  Heard also explains that because he lived in a separate unit from his co-plaintiffs, he could no longer meet with his co-plaintiffs to discuss their case or "conduct legal research," and, following his transfer, Heard states that he "lost [thirty] days of being able to access the law library."  (*Id.* at PageID.94, 99, 117.)  By contrast, Heard describes Auburn as an "honor unit" which ostensibly has more privileges

than other units.[2]  (*ECF No. 11, PageID.64*); *see* James V. O'Connor, *The Privileged: Inmates Who Earn Honor Rooms*, N.Y. Times, Oct. 15, 2000.

The Defendants, however, argue that there was effectively no difference between Auburn and Burns.  Auburn was not an "honor unit" with any special privileges, nor was Burns a gang unit.  (ECF No. 31, PageID.170–71, 176, 182.)  In both units, Heard enjoyed the same privileges and restrictions.  (*Id.*)  Indeed, Auburn and Burns were less than 100 yards apart and Heard could still access the law library and other common facilities from Burns.  (*Id.* at PageID.170–71.)  Further, even after his transfer, Heard continued his litigation without any apparent difficulty.  (*See id.* at PageID.202–41.)

After his transfer, Heard met separately with Strange and Adam Douglas, an inspector at the prison.  (ECF No. 23, PageID.94–95, 108–18.)  At both meetings, Heard states that Strange and Douglas warned him that if he did not stop pursuing his lawsuit and discussing Islam with other prisoners, then they would transfer him to a different prison. (*Id.* at PageID.113, 118.)  According to Heard, Douglas also claimed that Oosterhoff told him that he recommended Heard's transfer to stop Heard's litigation and religious practices.  (*Id.* at PageID.112, 114.)  Heard states that he did not stop either activity and prison officials eventually transferred him to a different prison.  (*Id.* at PageID.94–95; *see* ECF No. 31, PageID.205.)

---

[2] Between Heard's motion and his complaint, he provides little detail about how Auburn was an "honor unit," except to say (without any supporting exhibits) that Auburn "housed the facility dog program" and was "cleaner than other units."  (ECF No. 23, PageID.92; ECF No. 11, PageID.64.)

Douglas and Strange both deny that they warned Heard to stop litigating or practicing Islam. (ECF No. 31, PageID.169–70, 182.) Douglas contends that while he met Heard, the two only discussed "programming proposals" and legal research that Heard had been conducting—never did Douglas and Heard discuss the reasons for Heard's transfer. (*Id.* at PageID.169–70.)

After Heard was transferred to a different prison, he filed an earlier lawsuit against most of the present Defendants and several other prison officials, contesting both his intra-facility transfer to Burns and his inter-facility prison transfer. (*Id.* at PageID.203–05.) This Court dismissed Heard's intra-facility transfer claims without prejudice early in his litigation because Heard had not yet exhausted his administrative remedies. (*Id.* at PageID.216.)

Although Heard's inter-facility transfer claims were still the subject of an ongoing litigation, Heard filed this lawsuit on January 19, 2021, alleging that both his inter-facility and intra-facility transfers were in retaliation for his religious practices and his original lawsuit. (ECF No. 1.) This Court dismissed Heard's entire complaint, reasoning that it was duplicative of his other case, but later allowed him to amend his complaint to bring retaliation claims relating to his intra-facility transfer. (ECF Nos. 6, 9.) Plaintiff amended his complaint accordingly and eventually moved the Court to enter summary judgment on his behalf. (ECF Nos. 11, 23.)

### C.    Summary Judgment Standard

A court will grant a party's motion for summary judgment when the movant shows that "no genuine dispute as to any material fact" exists. Fed. R. Civ. P. 56(a). In reviewing the motion, the court must view all facts and inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party bears "the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)) (internal quotation marks omitted). In making its determination, a court may consider the plausibility of the movant's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper when the moving party shows that the non-moving party cannot meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot merely rest on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). The non-movant cannot withhold evidence until trial or rely on speculative possibilities that material issues of fact will appear later. 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2739 (3d ed. 1998). "[T]o withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party." *Cosmas v. Am. Express Centurion Bank*, 757 F. Supp. 2d 489, 492 (D. N.J. 2010). In doing so, the non-moving party cannot simply

assert that the other side's evidence lacks credibility. *Id.* at 493. And while a pro se party's arguments are entitled to liberal construction, "this liberal standard does not . . . 'relieve [the party] of his duty to meet the requirements necessary to defeat a motion for summary judgment.'" *Veloz v. New York*, 339 F. Supp.2d 505, 513 (S.D.N.Y. 2004) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)). "[A] pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479–80. The court will rely on the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992). After examining the evidence designated by the parties, the court then determines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so onesided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251–52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

### D.    Analysis

The government may not punish individuals for exercising a protected constitutional right. *Zilich v. Longo*, 34 F.3d 359, 365 (6th Cir. 1994). Even "government actions" that

typically would "not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to" retaliate against "an individual for [the] exercise of a constitutional right." *Thaddeus-X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999). Accordingly, a plaintiff alleging retaliation must establish three elements: (1) that he or she "engaged in protected conduct"; (2) that the defendant took "an adverse action" against him or her "that would deter a person of ordinary firmness from continuing to engage in that conduct"; and (3) that "but-for" the plaintiff's protected conduct, the Defendant would not have subjected the plaintiff to the adverse action. *Id.*; *Nieves v. Bartlett*, 139 S. Ct. 1715, 1721 (2019) (internal quotation marks omitted).

Here, even construing the facts in the light most favorable to the Defendants, I suggest that the evidence tends to show that the Defendants transferred Plaintiff to a different housing unit for engaging in protected conduct. However, because the Defendants raised a factual dispute as to whether Plaintiff's housing unit transfer was an adverse action, I suggest that this Court should not grant summary judgment.

### 1.    Protected Activity and Causation

Heard identifies three activities that fall within the ambit of the First Amendment. First, Heard claims that he sent "legal mail" on behalf of him and his co-plaintiffs; second, Heard claims that he sometimes met with his co-plaintiffs to discuss their litigation and conduct research; and third, Heard states that occasionally he would discuss Islam with his co-plaintiffs.[3]  (ECF No. 23, PageID.115–16.)

---

[3] Plaintiff alleges that his co-plaintiffs were also Muslim, but he provides no exhibits to support this allegation.  (ECF No. 11, PageID.62); *see Lee*, 902 F. Supp. at 429.

While Defendants provide no evidence suggesting that Heard did not send legal mail, it is not clear whether the Defendants contest the remaining two activities.  The Defendants claim that Heard proselytized other prisoners into the Nation of Islam, which they argue is not a protected activity.  (ECF No. 31, PageID.170–71, 175, 181–82.)  But while the Defendants appear to suggest that Heard's meetings with his co-plaintiffs were actually religious gatherings, the Defendants do not establish who Heard proselytized to or when he was proselytizing.  (*See id.* at PageID.151–52.)  Indeed, Oosterhoff and Strange provide affidavits broadly claiming that Alcorn observed Heard proselytizing to groups of prisoners without any further detail.  (*See id.* at PageID.175, 181–82; ECF No. 23, PageID.104.)

Although the Court must accept Defendants' assertion that Alcorn saw Heard proselytizing, this does not mean that Heard did not also meet with his co-plaintiffs to discuss their case and their common religion.  *See Matsushita*, 475 U.S. at 587.  These events are not mutually exclusive, and the evidence available to the Court suggests that these were not the same meetings.  (*See* ECF No. 31, PageID.170–71, 175, 181–82.)  While Heard claimed that he met exclusively with his co-plaintiffs when they would discuss their litigation, Alcorn identified three individuals he observed in Heard's meetings who were not involved in Heard's case, and Alcorn did not observe one of Heard's co-plaintiff's in these meetings.  (ECF No. 23, PageID.104.)  This suggests that the meetings where Heard purportedly proselytized to other prisoners were not the same meetings he claims were with his co-plaintiffs.  Accordingly, although the Defendants support their position that Heard

10

proselytized to other prisoners, they also do not genuinely dispute Heard's claims that he discussed his religion and litigation with his co-plaintiffs.

Having established which activities are at issue, the next question is whether these activities were protected by the First Amendment.  The First Amendment prohibits the government from "abridging the freedom of speech," or restricting either "the free exercise" of religion or the right to "petition the Government for a redress of grievances." U.S. Const. amend. I.  Generally, the freedoms to discuss religion with members of one's faith, pursue litigation, and even proselytize, are protected by the First Amendment.  *See Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).  But prisoners do not enjoy the same protections as nonincarcerated individuals.  Although prisoners do not lose their First Amendment rights upon incarceration, their interests must be balanced against "the legitimate penological objectives of the corrections system."  *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Accordingly, the government is entitled to "a considerable degree of deference" and it may impose any restrictions on a prisoner's speech or religious practices "that are 'reasonably related to legitimate penological interests.'" *Thaddeus-X*, 175 F.3d at 390 (quoting *Turner v. Safley*, 482 U.S. 78, 89–91 (1987)).

Unfortunately, this rule does not map neatly onto retaliation claims.  Unlike typical First Amendment challenges where the Court asks whether a "policy" or "action" is constitutional, a retaliation claim asks whether the individual's conduct is protected. *Compare id.*, *with Sherbert v. Verner*, 374 U.S. 398, 412 (1963) (Douglas, J., concurring).

11

Retaliation claims thus shift the court's focus from the Government's conduct to the individual's First Amendment activity. *See Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990). And, unlike most First Amendment challenges, a prisoner alleging retaliation need not necessarily have violated a specific prison regulation. *See Thaddeus-X*, 175 F.3d at 386.

This presents an issue because First Amendment rights are never absolute. *Elrod v. Burns*, 427 U.S. 347, 360 (1976). Individuals have interests in First Amendment activity, but whether these interests are protected depends entirely on the context in which they assert a right. *Id.* It is impossible to state whether an activity is "protected" without a government action that inhibits that activity. *Id.* The Court cannot conclude, in a vacuum, that a prisoner has a right under the First Amendment—while a right may be protected in one context, the same right may also be infringed upon in a different context. *See id.*

Thus, to determine whether a First Amendment activity is protected, the Court must weigh the prisoner's interest in an activity against some government action. *See id.*; *Thaddeus-X*, 175 F.3d at 390. But it is not obvious which government action a court should evaluate in retaliation cases. The parties seem to suggest that the Court should evaluate Plaintiff's activities against preexisting prison regulations. Indeed, the Sixth Circuit has explained that "if a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct' . . . ." *Thaddeus-X*, 175 F.3d at 395. Referencing this language, both parties center their discussions around an MDOC policy that prohibits proselytization, and, assuming that the policy is legitimate, analyze whether Heard violated this policy.

12

However, no Defendant purports to have been enforcing this specific policy when Heard was transferred.

I suggest that the parties read *Thaddeus-X* too narrowly. While *Thaddeus-X* correctly stated that violations of "legitimate" prison regulations are not protected under the First Amendment, this rule does not completely explain how courts should analyze whether conduct is protected by the First Amendment. *Thaddeus-X*, 175 F.3d at 395. There may be situations where prison officials "retaliate" against a prisoner for speech or religious practices that are not addressed by any prison regulation. But a prisoner's First Amendment activity is not "protected" simply because prison officials have not yet tried to restrict it through some formal policy. *See Davis v. Regents of U. of Michigan*, No. 19-12121, 2021 WL 2885806, at *6 (E.D. Mich. Jul. 9, 2021) (reasoning that a prisoner's speech might not be protected "[e]ven without a prison regulation at issue"). I suggest that, to evaluate whether an activity is protected, the Court should also ask whether the allegedly retaliatory conduct itself reasonably furthers a legitimate penological interest. *See id.* After all, this is the conduct that a prisoner bringing a retaliation claim alleges "chill[ed]" his First Amendment activities. *Thaddeus-X*, 175 F.3d at 397 (citing *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir.1998)). If a "retaliatory" action is reasonable, then whatever action it discourages is not protected by the First Amendment. *See Turner*, 482 U.S. at 89–91.

Accordingly, here, Heard's activities were protected under the First Amendment unless his transfer was reasonably related to some legitimate penological interest. To assess the reasonableness of Heard's transfer, the Court should consider the following four

13

factors: (1) the existence of any "'valid, rational connection' between the" transfer "and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right" would have on the prison; and (4) "the absence of ready alternatives." *Id.* A government action cannot be reasonable with no "rational connection" between its goals and its means. *Id.* at 89–90 ("[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational.").

The Defendants state that they transferred Heard to a different cell to prevent him from proselytizing either the Nation of Islam or the Moorish Science Temple of America to other prisoners. (ECF No. 31, PageID.151–52, 181; ECF No. 23, PageID.105.) The Defendants feared that by preaching to younger prisoners, Heard might gain undue influence over the minors in the prison. (ECF No. 31, PageID.162, 181.) As Douglas explains in his affidavit, "in prison, some religious groups garner power, respect, and authority which can be used in nefarious ways." (*Id.* at PageID.171.) Ostensibly, the Defendants were concerned with that by gaining power over other prisoners, Heard threatened prison safety and order—both of which are legitimate interests. *Harbin-Bey v. Rutter*, 420 F.3d 571, 578 (6th Cir. 2005) (quoting *Thornburgh v. Abbott*, 490 U.S. 401, 404 (1989)); (*see id.* at PageID.171, 176, 181.)

The more difficult question is whether Heard's transfer was reasonably calculated to protect prison safety and order. Historically, the Supreme Court has been sympathetic

to proselytization, even in prisons.  In *Cruz v. Beto*, prison officials placed a Buddhist inmate "in solitary confinement on a diet of bread and water for two weeks, without access to newspapers, magazines, or other sources of news," because the inmate had shared religious material with other prisoners.  405 U.S. 319, 319 (1972).  The district court upheld the prison's actions, reasoning that proselytization could give prisoners control over their fellow inmates, which could potentially "lead to a 'convict-run' and not a state-controlled prison system."  *Cruz v. Beto*, 329 F. Supp. 443, 446 (1970).  But the Supreme Court reversed, stating simply that the prison's actions, if true, violated the First Amendment notwithstanding any interests the state had in controlling its prisoners.  *Cruz*, 405 U.S. at 322.

If *Cruz* was still good law, it might be controlling here.  However, *Cruz* predates the reasonableness test established in *Turner*, and it does not appear that *Cruz* implicitly applied this test.  *See id.*  As Justice Marshall explained in *Jones v. North Carolina Prisoners' Labor Union, Inc.*, the *Cruz* Court "did not even inquire whether" the state's action "was rational."  433 U.S. 119, 143 (1977 (Marshall, J., dissenting).  Had the *Cruz* Court considered whether the prison's restriction was reasonably related to a legitimate goal, it may have reached a different result.  *See id.*

Beyond *Cruz*, few cases analyze a prisoner's right to proselytize his or her religion, but those that do generally require prison officials to establish concrete reasons why proselytization might threaten prison security.  *See, e.g., Spratt v. Rhode Island Dep't of*

15

*Corrections*, 482 F.3d 33, 39 (1st Cir. 2007). *Contra Anderson v. Angelone*, 123 F.3d 1197, 1199 (9th Cir. 1997); *Hadi v. Horn*, 830 F.2d 779, 784 (7th Cir. 1987).

For example, the First Circuit has held that speculative concerns that a prisoner might gain "influence" over other inmates did not justify a prison's ban on preaching did not further a compelling interest "in maintaining prison security" under the Religious Land Use and Institutionalized Persons Act ("RLUIPA").[4] *Spratt*, 482 F.3d at 39. Chaplains at a Rhode Island prison allowed the plaintiff in *Spratt* to give weekly sermons to other prisoners for seven years until the prison's warden enforced a regulation that prohibited inmates from preaching and proselytizing to other prisoners. *Id.* at 35. The plaintiff sued the Rhode Island Department of Corrections under the RLUIPA, and the Department moved for summary judgment. *Id.* at 35–36. In support of its motion, the Department submitted an affidavit which broadly stated that by preaching to other inmates, the plaintiff took was a "leader," and "having leaders in prison . . . is detrimental to prison security . . . ." *Id.* at 39. The First Circuit rejected this argument, explaining that such broad assertions were "insufficient to defeat a motion for summary judgment, let alone to sustain one." *Id.* The court explained that without citing any specific instances where religious leadership

---

[4] The RLUIPA affords more protections to prisoners than the First Amendment. *Lovelace v. Lee*, 472 F.3d 174, 199–200 (4th Cir. 2006). While restrictions on a prisoner's First Amendment rights pass constitutional muster if reasonably related to a legitimate interest, under the RLUIPA, prisons may only infringe on religious liberties if their actions achieve compelling interests through the least restrictive means. *Id.* at 185, 199. Still, the RLUIPA also requires that any state action must "further" a compelling state interest, which is essentially the same as *Turner*'s requirement that a policy must have a "rational connection" to a state interest. *Compare Spratt*, 482 F.3d at 39, *with Turner*, 482 U.S. at 89–90.

created security concerns, the Department could not show that its policy furthered its interest in prison safety.  *Id.* at 39–40.

By contrast, in *Cooper v. Tard*, the Third Circuit held that a prison reasonably prohibited members of the Nation of Islam from preaching, but only after the defendants established concrete reasons why the policy furthered a legitimate penological interest.  855 F.2d 125, 129 (3d Cir. 1988).  Indeed, the court went to great lengths to note that by upholding the restriction, it did "not deal in abstractions."  *Id.*  One of the plaintiffs who desired to preach was confined to a high-risk, "management control unit" and had frequently "been suspended" from his role as an Imam "for behavior unbecoming . . . to a Muslim minister."  *Id.* at 126, 129.  Moreover, other inmates recognized this plaintiff as a leader, not just a proselytizer, and they had established an organized hierarchy of Muslims within the prison.  *Id.* at 129; *see also Tisdale v. Dobbs*, 807 F.2d 734, 738–39 (8th Cir.1986) (upholding a restriction on inmate-led religious services where "unsupervised group prayer meetings" had caused "dissension and unrest" in the same prison two years earlier).

I suggest that like *Spratt*, the Defendants provide no facts which demonstrate a need to restrict Heard's proselytization.  Although the Defendants cite general concerns that by proselytizing, Heard could become a "leader" which would give him power that he could use "in nefarious ways," they do not explain why religious leaders would threaten prison administration or security, nor do they cite any instances where religious leadership has had detrimental impacts on prison interests.  *Cf. Spratt*, 482 F.3d at 39.  The Defendants

do not claim that Heard is a dangerous prisoner, nor do they claim that members of the Nation of Islam in their prison have an established hierarchy.  *Cf. Cooper*, 855 F.2d at 129.

By providing nothing more than theoretical concerns, the Defendants have not supplied enough information to demonstrate a genuine dispute of material fact.  *See Spratt*, 482 F.3d at 39.  Without extenuating circumstances, proselytization alone does not pose a threat to prison security.  An inmate who professes his faith to nonbelievers certainly holds less influence than an inmate, like *Spratt*, who preaches to members of his or her own faith.  482 F.3d at 35.  And the mere fact that a prisoner might preach to other members of his faith does not alone mean that he can or will exercise control over his fellow believers.  Even if the other *Turner* factors may weigh in Defendants' favor, without any "valid, rational connection" between the transfer and the prison's interests, I suggest that the Heard's activities were protected.  *See* 482 U.S. at 89–90.  Therefore, even assuming that Heard proselytized his faith to other inmates, this would have been protected under the facts provided by the Defendants.[5]  And, because the Defendants have not demonstrated a reasonable need to infringe upon Heard's otherwise protected conduct, these activities are protected by the First Amendment.

---

[5] To the extent the Defendants argue that Plaintiff violated the MDOC policy against proselytization, I suggest that this argument fails for similar reasons.  The Defendants do not identify any legitimate interests that this policy might further beyond those already discussed, and the Court need not identify legitimate interests on the Defendants' behalf.  *Cf. Gomez v. Chill*, No. 11-cv-6844, 2015 WL 1853110, at *13 (S.D.N.Y. Apr. 17, 2015).  Moreover, the MDOC policy seems poorly equipped to prevent prisoners from gaining influence through proselytization because it permits proselytization whenever a prisoner has consent from other inmates.  (ECF No. 31, PageID.191.)

For these reasons, I suggest that, construing the facts in the light most favorable to the Defendants, Heard engaged in protected activities.  Specifically, Heard sent "legal mail" and met with his co-plaintiffs to conduct research[6] and discuss both Islam and their litigation.

Further, because proselytization is a protected activity under these facts, the Defendants have not demonstrated a material dispute regarding causation, with respect to Heard's religious retaliation claim.  To prevail in a retaliation claim, a plaintiff must demonstrate that but for some protected conduct, the defendants would not have taken an adverse action. *Maben v. Thelen*, 887 F.3d 252, 267 (6th Cir. 2018).  Here, the Defendants assert that they transferred Heard because he was proselytizing.  (ECF No. 31, PageID.151–52, 162, 181; ECF No. 23, PageID.105.)  Accordingly, even construing the facts in the light most favorable to the Defendants, Heard satisfies this element with respect to his religious retaliation claim because the Defendants transferred him for engaging in protected conduct. By the same token, however, the Defendants raise a genuine dispute of material fact regarding Heard's access to the courts retaliation claim.  Indeed, while Heard asserts that Oosterhoff desired to impede Heard's litigation, Oosterhoff maintains that his only motivation for transferring Heard was to prevent him from proselytizing.  (ECF No. 31, PageID.175–76; ECF No. 23, PageID.110.)

### 2.    Adverse action

---

[6] Even if Heard's transfer had a rational connection to some legitimate interest, Heard's conduct that relates to accessing the Courts might still be protected under the remaining *Turner* factors.  *See Lewis v. Casey*, 518 U.S. 343, 361–62 (1996); *Thadddeus-X*, 175 F.3d at 391 ("It is well established that prisoners have a constitutional right of access to the courts.")

Because Plaintiff has demonstrated that he was transferred for engaging in a protected activity, the success his motion turns on whether his transfer constituted an adverse action.  Not every injury "is constitutionally cognizable." *Thaddeus-X*, 175 F.3d at 396.  Merely "*de minimis* level[s] of imposition" do not implicate constitutional protections. *Ingraham v. Wright*, 430 U.S. 651, 674 (1977).  For this reason, a government action is "adverse" only if it "would 'deter a person of ordinary firmness' from the exercise of the right at stake." *Thaddeus-X*, 175 F.3d at 396 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982)).

Generally, a prison transfer—whether it be to a different cell or a different facility—would not deter a person of ordinary firmness from engaging in First Amendment activity. *Mulazim v. Corrigan*, 7 F. App'x 427, 431 (6th Cir. 2001).  This is because "prisoners are expected to endure more than the average citizen," and "transfers are common among prisons." *Siggers-El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005); *see also Harbin-Bey*, 420 F.3d at 577.

There are few circumstances where a prison transfer might deter an individual from engaging in protected conduct.  First, where a transfer foreseeably "inhibits" a prisoner's "ability to access the courts," it would deter an ordinary prisoner from engaging in protected conduct.   *Siggers-El*, 412 F.3d at 702, 704.  For example, in *Siggers-El v. Barlow*, prison officials transferred an inmate who was involved in litigation to a different facility, and as a result, the inmate lost a high paying job that he relied on to pay his attorney fees and had difficulty meeting with his attorney because he "was moved further away from

her." *Id.* at 697–98, 702.  The Sixth Circuit held that this transfer would deter a prisoner of ordinary firmness from engaging in protected conduct because the inmate's loss of access to counsel would have been a reasonably foreseeable consequence of his transfer. *Id.* at 702.

Likewise, Heard argues that his transfer physically prevented him from accessing the courts.  But construing the facts in the light most favorable to the Defendants, I suggest that not only would this not have been a foreseeable consequence of his transfer, but a juror might conclude that Heard's ability to access the courts was not inhibited.  Even after his transfer to Burns, Heard continued his litigation without any apparent difficulty.  (*See* ECF No. 31, PageID.159, 203–41.)  Heard continued to respond to deadlines and file motions, and he even petitioned the Supreme Court for a writ of certiorari.  (*Id.* at PageID.159.)  In the Burns facility, Heard had just as much access to the prison's facilities as he would have in Auburn, including the prison's law library, and he could have continued to meet with his co-plaintiffs in any shared facility, including the library.  (*Id.* at PageID.170–71, 181–82.)

The Sixth Circuit has also held that transfers to more restrictive units are adverse if the new unit is "comparable to . . . administrative segregation." *Thaddeus-X*, 175 F.3d at 396.  For example, transfers to "lockdown units," or changes in a prisoner's "security level" that would place additional restrictions on a prisoner, may be adverse. *Hill v. Lappin*, 630 F.3d 468 (6th Cir. 2010); *King v. Zamiara*, 150 F. App'x 485, 494 (6th Cir. 2005).  Still, courts generally do not consider transfers to general populations of different housing units

to be adverse, even if the new housing units are less desirable or more restrictive. *See Mullazim* 7 F. App'x at 431; *LaPine v. Johnson*, No. 1:17-cv-768, 2020 WL 6597342, at *4 (W.D. Mich. Jul. 20, 2020).

The Defendants here have demonstrated a genuine dispute of material fact as to whether Heard's transfer was adverse by filing affidavits which explain that both units were essentially identical.  (ECF No. 31, PageID.167–89.)  Indeed, not only was Heard's original unit not an "honor unit" with any special privileges, but Burns Unit was not a gang unit.  (*Id.* at PageID.170–71.)  Both Auburn and Burns housed prisoners belonging to the same security level, and prisoners in both units, which are no more than 100 yards apart, have equal access to all other facilities in the prison.  (*Id.*)  Accepting the Defendants factual assertions as true, a reasonable juror could conclude that Defendants did not subject Plaintiff to an adverse action.  *See Mullazim* 7 F. App'x at 431.  Because a genuine dispute exists as to this element, I suggest that the Court should not grant summary judgment in favor of Heard.[7]

### 3.    Personal Involvement

The Court also cannot enter summary judgment against Douglas or Alcorn because a trier of fact could determine that neither Defendant was personally involved in Plaintiff's transfer to Burns Unit.  To prevail on a § 1983 claim, a plaintiff must demonstrate that (1) the conduct about which he or she complains was committed by a person acting under color

---

[7] Heard also mentions that Douglas and Strange threatened to transfer him a second time after his original intra-facility transfer.  While threatened transfers can constitute adverse conduct, this lawsuit only concerns Heard's original, intra-facility transfer, not any subsequent harm.  *Maben v. Shaheen*, No. 17-10817, 2018 WL 3298076, at *5 (E.D. Mich. Jan. 31, 2018); (ECF No. 9.)

22

of state law and (2) that the conduct deprived him or her of a federal constitutional or statutory right. 42 U.S.C. § 1983 (2012). Additionally, a plaintiff must establish an affirmative link between the injury and the conduct of that defendant. *Rizzo v. Goode*, 423 U.S. 362, 371–72 (1976). To demonstrate an affirmative link, a plaintiff must make a clear showing that each named defendant was personally involved in the activity that forms the basis of the complaint. *Id.* at 375; *Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995).

A defendant may not be personally involved with an injury if his or her conduct was "too remote." For example, in *Martin v. Kazulkina*, an inmate sued prison officials who forced him to take psychotropic medication. No. 12-cv-14286, 2017 WL 971706, at *3 (E.D. Mich. Feb. 21, 2017). This Court held that a defendant who prepared a non-binding report, recommending that the inmate be provided involuntary treatment, was not personally involved in the prison's ultimate decision to provide treatment because she had "no authority to order that [the inmate] be involuntarily medicated." *Id.* at *7.

Similarly, here, Alcorn could not compel Heard's transfer. (ECF No. 31, PageID.186.) Only Oosterhoff and Strange, with the approval of their supervisor, could arrange Heard's transfer. (*Id.* at PageID.175.) A trier of fact could determine that Alcorn did nothing more than report to Oosterhoff that he witnessed Heard proselytizing to other prisoners. (*See* ECF No. 23, PageID.104.) And even if a trier of fact found that Alcorn recommended that Oosterhoff transfer Heard, this also would not constitute personal involvement because Alcorn had "no authority to order" Heard's transfer. *Cf. Laporte v. City of Nashville*, No. 3:18-cv-00282, 2019 WL 845413, at *5 (M.D. Tenn. Feb. 21, 2019);

23

*Martin*, 2017 WL 971706, at *3; *Bradley v. Goins*, No. C12-2020-RSM, 2013 WL 4809293, at *3 (W.D. Wash. Sept. 9, 2013).

Nor could a trier of fact conclude that Douglas was involved in Heard's transfer. Indeed, under the facts presented by both parties, Douglas was not involved in this decision and he did not interact with Heard until after Heard's transfer occurred.  (*See* ECF No. 23, PageID.94–95.)

Still, Heard suggests that after his transfer to Burns, Douglas threatened to transfer him again and eventually paced him on a transfer list, which ultimately resulted in officials transferring Heard to a different facility.  (*See id.* at PageID.95; ECF No. 9.)  However, these events are not at issue in this case.  Heard previously filed a lawsuit against a group of officials, including Douglas, concerning the same events.  (ECF No. 6.)  In that litigation, Heard's claims concerning his transfer to Burns were dismissed without prejudice early on because he had not yet exhausted his administrative remedies.  (ECF Nos. 6, 9.)  After presumably exhausting his administrative remedies, Heard brought this lawsuit.  (ECF No. 1.)  The Court dismissed Heard's complaint in its entirety, reasoning that it was duplicative of his other lawsuit, but the Court later amended its judgment to allow Heard to bring claims concerning his intra-facility transfer.  (ECF Nos. 6, 9.)  The Court did not allow Heard to bring any other claims, and for that reason, he cannot bring any claims against Douglas for events that occurred after his transfer.  (ECF No. 9, PageID.54–55.)

For these reasons, I suggest that the Court cannot enter summary judgment against Douglas or Alcorn.

### E. Conclusion

For the reasons discussed above, **I RECOMMEND** that this Court **DENY** Plaintiff's motion for summary judgement (ECF No. 23.)

### III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this R&R to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the

objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  March 22, 2022

S/PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge